IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FRANCISCO JAVIER MACIAS-
PEREZ,

        Defendant.

No. CR 11-2024

REPORT AND
RECOMMENDATION

---

## TABLE OF CONTENTS

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . 2

III.  **ISSUES PRESENTED** . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  **RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Warrants for Placement of GPS Devices* . . . . . . . . . . . 5
     C.    *Warrant for Cell Phone Information* . . . . . . . . . . . . . 7
     D.    *Warrant for Search of Oaklawn Residence* . . . . . . . . . . 8

V.   **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     A.    *Defendant's Franks Claims* . . . . . . . . . . . . . . . . . . 12
          1.   *Probable Cause for the Warrant* . . . . . . . . . . . 12
          2.   *Alleged Franks Violations* . . . . . . . . . . . . . . 16
              a.   *Transfer of Ownership of the White Mini-Van* . . . . . 17
              b.   *Identity of the Payor on a Check* . . . . . . . . . . . 20
              c.   *Lack of Detail About a "Controlled Money Transaction"* . . . . . . . . . . . . . . . . . . . . . . 21
              d.   *Information in Warrant for Cell Phone Conflicts with Other Warrants* . . . . . . . . . . . . . . . . . . . . . 22
              e.   *Cumulative Effect of Omissions and Misstatements* . . 23
     B.    *The Government's Leon Claim* . . . . . . . . . . . . . . . . 27

VI.  **RECOMMENDATION** . . . . . . . . . . . . . . . . . . . . . . . . 28

# I. INTRODUCTION

On the 13th day of June 2011, this matter came on for hearing on the Motion to Suppress Evidence (docket number 19), filed by the Defendant on May 31, 2011, as amended (docket number 32) on June 9, 2011. The Government filed its Resistance (docket number 25) on June 3, 2011. The Government was represented by Assistant United States Attorney Patrick J. Reinert. Defendant Francisco Javier Macias-Perez appeared in person and was represented by his attorney, Mark C. Meyer.

# II. PROCEDURAL HISTORY

On April 19, 2011, Defendant was charged by Indictment with conspiracy to distribute 500 grams or more of methamphetamine which contained 50 grams or more of pure methamphetamine (Count 1), distribution of 450.2 grams of methamphetamine which contained 50 grams or more of pure methamphetamine (Count 2), and possession with the intent to distribute 50 grams or more of methamphetamine (Count 3).

At the arraignment on April 27, 2011, Defendant entered a plea of not guilty. Trial was initially scheduled for June 27, 2011. At a status hearing held on June 1, 2011, both parties agreed, due to the pending motions, that the trial could not proceed as scheduled. Therefore, the trial was rescheduled for August 1, 2011.

On May 31, 2011, Defendant timely filed the instant motion to suppress.

# III. ISSUES PRESENTED

On April 4, 2011, a search was conducted of Defendant's home on Oaklawn Drive in Waterloo, pursuant to a search warrant issued on April 1, 2011. Defendant claims that material facts were intentionally or recklessly omitted from the warrant application, and that misinformation was included in the application, thereby rendering the resulting warrant unsupported by probable cause and void.

# IV. RELEVANT FACTS

## A. Background

In an affidavit submitted in support of the application to search Defendant's residence, Nicholas P. Berry – a Waterloo police officer currently assigned to the Tri-

County Drug Task Force – states that "investigators have been aware of a family residing in the Waterloo area heavily involved with distributing large quantities of methamphetamine and marijuana."[1] Investigators commonly referred to the group as the "Macias's."[2] The investigation dated back to 2007. In late 2009 or early 2010, Berry learned that "Javier Macias" was working with Louis Garcia, also known as "Sinaloa," in transporting methamphetamine and cocaine from California to Waterloo. Garcia was arrested in Nevada after 4.5 pounds of cocaine were found concealed behind the tail lights of his vehicle, and it was believed that "Javier Macias" fled the Waterloo area back to California.

At the instant hearing, Officer Berry testified that he "was aware of a subject who identified himself as Javier Macias being involved in trafficking methamphetamine through the Waterloo area." In February 2011, Berry developed a confidential informant ("CI") to work with the "target." Berry's testimony at the hearing regarding the investigation was imprecise, at best. Berry admitted that he didn't come prepared to answer questions regarding the details of transactions between the confidential informant and Defendant. Moreover, he failed to bring his reports with him, so it was not possible to attempt to refresh his recollection. Because of Berry's unpreparedness, lack of knowledge, and equivocation, it is difficult for the Court to piece together the exact sequence of events.

Sometime after March 4, the CI contacted Berry and notified him there was a 40 to 50-year-old Hispanic subject who was involved in distributing large quantities of methamphetamine. Other than this general description, the CI could only identify the subject by the white mini-van he was driving.[3] Apparently on March 8, the CI contacted

---

[1] *See* Defendant's Exhibit D-1 at 7.

[2] *Id.*

[3] We know that this notification must have occurred after March 4, because Jan Kidwell, a private investigator hired by Defendant, determined the white mini-van transferred ownership from Jessica Murray to a Hispanic man on March 4.

Jesus Leyva-Macias regarding the purchase of methamphetamine.[4] It was apparently on that date that the CI contacted Officer Berry and provided him with the location of a Hispanic male driving a white mini-van in possession of a quantity of methamphetamine consistent with the distribution of methamphetamine. Investigators were able to locate the mini-van and follow it to a residence on Oaklawn Avenue in Waterloo. A search of police reports revealed that Francisco J. Macias had previously reported a burglary to the residence.

A search of the records revealed that the registered owner of the mini-van was Eduardo J. Lopez-Macias, born on February 24, 1981. Apparently, Officer Berry did not believe 30-year-old Lopez-Macias was the 40 to 50-year-old Hispanic that the CI reported, because in his addendum submitted in support of an application for authority to attach a GPS device to the mini-van, he noted that after searching "other databases" he was "unable to positively identify the forty to fifty year old Hispanic male."

According to Officer Berry, he conducted surveillance outside the Oaklawn Avenue house on March 10. Berry observed a person matching the initial description given by the CI, whom Berry believed to be Defendant, and another male, whom he believed to be Lopez-Macias, "coming and going" from the residence. According to Berry's addendum on his final warrant request, after being shown a photograph of "Javier Macias" from a previous investigation, the CI confirmed it "was the same subject in question." Berry also observed a white Chevrolet Colorado truck at the Oaklawn Avenue residence, which was also registered to Lopez-Macias.

When the CI contacted Jesus Leyva-Macias again on March 11, he was told that he should contact Defendant regarding future drug transactions. Later that day, the CI contacted Defendant and made arrangements to purchase methamphetamine. Officer

---

[4] It is unclear from Officer Berry's testimony whether a controlled transaction occurred on that date, and whether Defendant was present at that time. At the hearing, Berry testified that the CI had obtained 4-5 ounces of methamphetamine from Defendant, but it is unclear whether it was on March 8.

Berry testified at the instant hearing that methamphetamine was "fronted" by Defendant on that date, but was unsure whether any cash exchanged hands.

## B. *Warrants for Placement of GPS Devices*

On March 11, 2011, Officer Berry submitted applications for search warrants, seeking permission to place a global positioning system (GPS) on a 2005 white Chrysler Town and Country mini-van and on a white Chevrolet Colorado truck.[5] In supporting addenda attached to the respective applications, Berry asserts that "during the past month" a CI had provided him with information regarding "a Hispanic subject approximately forty to fifty years old who is involved in distributing large quantities of methamphetamine." The CI was only able to identify the person as a Hispanic male driving "a white in color mini-van." According to the addenda, "[o]n one certain occasion within the previous three weeks," the CI advised Berry that he had observed the Hispanic male in the mini-van "in possession of a quantity of methamphetamine consistent with the distribution of methamphetamine." Berry testified at the instant hearing that he was intentionally vague in submitting the addendum in order to protect the identity and safety of the CI.

At the instant hearing, Defendant offered evidence which suggests that the mini-van could not have been in Defendant's possession prior to March 4, 2011 – one week prior to the application for search warrant. Jan Kidwell, a private investigator employed by Defendant, testified that he interviewed Jessica Lynn Murray shortly before the instant hearing.[6] Murray told Kidwell that she had advertised the mini-van for sale on Craig's List. On March 4, a Friday, several Hispanic persons came to her house to view the van. Murray had never seen or met any of these persons prior to that day. After they decided to purchase the van, Murray had one of the persons ride with her to the bank, which held title on the van as security on a loan. When they arrived at the bank, the purchaser handed

_____

[5] The applications and subsequent search warrants were introduced at the hearing as Defendant's Exhibits D-2 and D-3.

[6] Kidwell's report following his interview with Ms. Murray was introduced as Defendant's Exhibit A-2.

Murray cash for the van, she went into the bank and paid the balance remaining on her loan, the bank gave her the title, and she then gave the title to the new purchaser. According to Kidwell, Murray did not identify the actual purchaser of the vehicle. Defendant's Exhibit A-1 is a certificate of title and registration receipt, indicating that title to the 2005 Chrysler Town and Country mini-van was transferred from Jessica Lynn Murray to Eduardo J. Lopez-Macias on March 7.

In his addenda filed in support of the applications for the GPS devices, dated March 11, 2011, Officer Berry disclosed that the vehicles were registered to Eduardo J. Lopez-Macias. Berry did not disclose, however, that the white mini-van had been registered in Lopez-Macias' name only four days earlier. At the instant hearing, Berry testified that it was not until Defendant filed his motion to suppress that Berry learned that ownership of the mini-van had only recently been transferred. Berry acknowledged that information regarding the prior owner and the date the vehicle was transferred "very well could have" been included in the information which he reviewed, but that "I might not have seen that." The address shown for Lopez-Macias on the certificate of title and registration is a residence on 7th Street in Waterloo, not the Oaklawn Avenue address. Berry testified that he did not include that information in his addendum because "maybe I didn't think it was important."

The applications for the GPS devices make no reference to Defendant. The caption on the applications and resulting warrants refer to Eduardo J. Lopez Macias. After tying the mini-van to the possible distribution of methamphetamine, the addenda state that investigators followed the van to the Oaklawn Street address.[7] The addenda state that in searching Department of Transportation records, the vehicle "returns to" Eduardo J. Lopez Macias. The addendum submitted in support of the GPS device for the Chevrolet

---

[7] In the applications and warrants submitted at the time of hearing, the Oaklawn address is variously referred to Oaklawn Avenue, Oaklawn Street, and Oaklawn Drive. Defendant does not claim, however, that there is any confusion regarding the address in question.

Colorado truck states that the truck was also observed at the Oaklawn address, and is also registered to Eduardo J. Lopez-Macias.

According to the "informant's attachment" included in the applications, the CI was known by Officer Berry for two years, had supplied information over ten times, had helped supply the basis for four search warrants, and had led to the making of one arrest. Prior information provided by the CI had led to the discovery and seizure of contraband, and information supplied by the informant had been corroborated by law enforcement personnel. The informant's attachment disclosed that the CI had a prior "felony narcotic violation" and was being paid for his or her services.

A state judicial officer found probable cause and issued search warrants, authorizing the placement of a global positioning system on the 2005 white Chrysler Town and Country mini-van and the white Chevrolet Colorado truck.[8]

## C. *Warrant for Cell Phone Information*

On March 22, 2011, John J. Austin, a special agent with the Iowa Department of Public Safety, submitted an application for a search warrant, seeking cell phone information from Sprint Nextell Corporation, including recent "cell site" information for "triangulation" purposes. According to Austin's sworn addendum, "[d]uring the past few years," authorities had been investigating Francisco J. Macias and his involvement in the "Macias Drug Trafficking Organization."[9] Investigators learned that Francisco J. Macias had used telephone number xxx-xxx-2910 to arrange and facilitate drug trafficking. Referring to the same CI used in the earlier warrants, Austin advised the judicial officer that the CI had contacted Francisco J. Macias at the designated phone number "to speak about narcotic related activity."

---

[8] The signature of the judicial officer is illegible and his or her name does not appear elsewhere in the documents.

[9] The application, supporting documents, and search warrant were introduced at the instant hearing as Defendant's Exhibit D-4.

Special Agent Austin's addendum advises the judicial officer that a covert GPS monitoring device had been placed on Francisco J. Macias' vehicle pursuant to a search warrant. The vehicle had been observed traveling to the California area. The addendum states that "it is common for drug traffickers to courier money to California, which has been identified as a source state." The application asks that Sprint/Nextell be required to provide information regarding the cell phone, including cell tower and triangulation information. Finding that probable cause existed, a state judicial officer issued a search warrant.[10]

### D. *Warrant for Search of Oaklawn Residence*

On April 1, 2011, Officer Berry submitted an application for authority to search the residence on "Oaklawn Drive."[11] Some of the information contained in Berry's sworn addendum is identical to that included in the applications for the GPS warrants. Specifically, Berry refers to a confidential informant who provided information regarding a Hispanic subject involved in the distribution of large quantifies of methamphetamine. The CI could only identify the subject by the white mini-van he was driving. Berry advises the judicial officer that "on one certain occasion" the CI notified authorities of the subject's current location, and investigators followed the mini-van to the residence on "Oaklawn Avenue."[12] Berry's addendum stated that "[o]ver the past several days your affiant has confirmed this van to be at this residence." According to the addendum, police records reflected that Francisco J. Macias had previously reported a burglary to the

---

[10] Again, the signature of the judicial officer is illegible, and his or her name does not appear elsewhere on the documents.

[11] The application, supporting documents, and warrant were introduced at the instant hearing as Defendant's Exhibit D-1.

[12] The captions on the application and the warrant refer to "Oaklawn Drive." The body of the application and warrant refer to "Oaklawn Avenue" and "Oaklawn Street" in the same sentence. Later in the same sentence, the application and warrant simply refer to "Oaklawn." While Defendant does not claim that these differences have any legal significance, it represents sloppy police work.

residence on Oaklawn Avenue; while according to DOT records, the mini-van belonged to Eduardo Lopez-Macias. The addendum does not disclose that the address shown on the vehicle registration for Eduardo Lopez-Macias is different than the Oaklawn Avenue address.

Officer Berry's addendum states that while performing surveillance on the residence on March 10, 2011, he observed the van at the residence. He also observed a Hispanic male "who met the descriptions given by the confidential informant" coming to and from the residence. According to the addendum, while the mini-van was parked in the driveway, the Hispanic male was coming and going in a white Chevrolet Colorado truck, which was also registered to Eduardo Lopez-Macias.

Officer Berry states in his addendum that during the March 10, 2011 surveillance operation, he "observed the target subject." Berry recognized the person's face from a previous investigation. According to Berry's addendum, during the previous investigation the subject identified himself as "Javier Macias." Following the surveillance, Berry showed the CI a photograph of "Javier Macias" that had been seized as evidence during the previous investigation, and the CI confirmed that it was "the same subject in question."

The addendum goes on to state that authorities obtained a search warrant to place GPS devices on the white mini-van and the white Colorado truck. During the following two weeks, Berry found that "most nights both of these vehicles would be parked" at the Oaklawn Avenue residence.

The addendum filed in support of the application for search warrant also describes the events of March 18, 2011. Investigators observed that the white Chevrolet Colorado truck was at a Wells Fargo bank in Waterloo. After the truck left the bank, Berry passed the vehicle and "observed that the driver was indeed the target Hispanic male driving and appeared there were no other occupants in the vehicle." By contacting the bank, the officers learned that the subject had identified himself as Francisco J. Macias, and had given a residence address in Moreno Valley, California. While at the bank on March 18,

the subject deposited a check for $14,000 into his account, together with a $3,000 cash deposit into another account.[13]

At the instant hearing, Defendant offered evidence regarding the apparent source of the check deposited by Defendant on March 18, 2011. According to a "bill of sale" dated March 18, 2011, Armando Alcantara Gonzalez purchased a restaurant called "Ponchos" from Jesus Leyva Macias.[14] The terms of the sale called for the buyer to pay the seller the sum of $15,000 on March 1, 2011, and a balance of $20,000 on or before June 18, 2011. Officer Berry confirmed at the hearing that the payor on the $14,000 check deposited on March 18 was Armando Gonzalez. Berry testified that he "didn't remember exactly" if he learned of the check's source when he first obtained information from the bank, or at a later time. In any event, Berry did not disclose the source of the check in his addendum because he did not think it was important.

The addendum states that on the following day, March 19, 2011, the GPS monitoring device revealed that the mini-van was leaving the state. On the following day, the GPS system lost power and the last contact was in Leeds, Utah. According to the addendum, this direction of travel is consistent with traveling to the Los Angeles, California area. The addendum notes that "during the next week" investigators obtained a search warrant for "the known cell phone for the target subject," in order to utilize the triangulation feature. Investigators discovered that the phone was located in Moreno Valley, California. On March 26, 2011, the phone appeared to be headed back to Waterloo.

According to the addendum, on March 27, 2011, task force officers intercepted the vehicle on Interstate 80 west of Des Moines and followed it to a residence in Marshalltown. Officer Berry observed "the target Hispanic male" entering and exiting the

---

[13] Testimony at the hearing suggested that Defendant may have been involved in a controlled drug transaction with the CI on March 18, but Officer Berry's addendum makes no mention of it.

[14] The bill of sale was introduced at the hearing as Defendant's Exhibit B-1.

residence. The "target" then entered the driver's seat of the van and was followed back to the Oaklawn Avenue address in Waterloo, where he was observed entering the residence.

The addendum then provided the judicial officer with information regarding an investigation of the Macias family, dating back to 2007. Among other things, the addendum states that in August 2009, a vehicle being driven by Jesus Leyva-Macias was stopped following surveillance and approximately two pounds of marijuana were seized. In late 2009 or early 2010, Officer Berry was the case agent in an investigation involving Louis Garcia, also known as Sinaloa, and a subject identified as "Javier Macias." Garcia was arrested in Nevada and approximately 4.5 pounds of cocaine were located concealed behind the tail lights of his vehicle, and it was believed that "Javier Macias" possibly fled the Waterloo area back to California. In his addendum, Berry alerts the judicial officer to the fact that the target's true name is unknown: "To this point in the investigation your affiant has been unable to positively identify the target subject only identified through this investigation as MACIAS, FRANCISCO." It should be recalled that earlier in the addendum, Berry identified "Javier Macias" from the earlier investigation as the same person as the Defendant, Francisco Javier Macias-Perez.

The addendum on the application for the warrant issued April 1 also states, somewhat cryptically, that "[o]ver the past 24 to 72 hours your affiant utilized the confidential informant to meet with the target in this investigation and make a controlled money transaction on a drug debt." Apparently, the reference is to a transaction between the CI and Defendant on March 29, after which Defendant was followed to an address in Elk Run Heights. According to Officer Berry's testimony at the hearing, Defendant's girlfriend lives at the Elk Run Heights residence. Berry also testified that there were additional controlled transactions between the CI and Defendant during the March 8 to March 29 time frame, but, for whatever reasons, those were not included in the addendum.

Berry could not recall the details of those transactions, other than to confirm that none of the transactions occurred at the Oaklawn Avenue address.[15]

Judge Kellyann Lekar found probable cause and issued a search warrant for the residence on Oaklawn Avenue, as well as the 2005 white Chrysler Town and County mini-van and the white Chevrolet Colorado truck. The warrant was executed on April 4, 2011. Additional facts as they pertain to the conclusions of law will be set forth below.

## V. DISCUSSION

In his motion to suppress evidence, Defendant asks that the Court suppress any evidence seized during a search of the residence on Oaklawn Avenue. Initially, it should be noted that Defendant does *not* claim that the application and supporting documents lack probable cause for the issuance of a warrant. Instead, Defendant claims that in three instances material information was omitted from the application which, if the information had been included, would defeat a finding of probable cause. Defendant also asserts that information regarding the cell phone conflicted with information contained in other warrant applications and, if the misinformation had not been included, probable cause would not have existed. In short, Defendant claims that the warrant is void pursuant to an application of *Franks v. Delaware*, 438 U.S. 154 (1978). The Government denies Defendant's claims and affirmatively asserts that the officers relied on the search warrant in good faith and, therefore, the exclusionary rule would not apply. *See United States v. Leon*, 468 U.S. 897 (1984).

### A. Defendant's Franks Claims

### 1. Probable Cause for the Warrant

Before moving on to Defendant's *Franks* claims, the Court pauses to review generally the law regarding search warrants. The Fourth Amendment to the United States Constitution protects persons and their houses against unreasonable searches and seizures. "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation."

---

[15] At the hearing, Berry did note that on either March 11 or March 18 he followed Defendant from a controlled buy to the Oaklawn Avenue address.

U.S. CONST. AMEND. IV. In making a probable cause determination, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Stated otherwise:

> If an affidavit in support of a Search Warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" probable cause to issue the warrant has been established.

*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)). Probable cause "is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 577 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231). As such, the Court examines the sufficiency of a search warrant affidavit using a "common sense" and not a "hypertechnical" approach. *Grant*, 490 F.3d at 632 (citing *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)). The totality of the circumstances is considered in determining whether probable cause was established to issue a search warrant. *Id.* at 631 (citation omitted).

In this case, no oral testimony was presented to Judge Lekar when the search warrant for the residence and the vehicles was issued. When an issuing judge relies solely on the written application to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). Here, Officer Berry's application and sworn attachments advised Judge Lekar of the following: 1) the affiant, Officer Berry, has been a Waterloo police officer since 2004 and was assigned to the Tri-County Drug Enforcement Task Force in March 2009; 2) previous to

this investigation, Berry and other investigators had been aware of a family residing in the Waterloo area, who they referred to as the "Macias's," that was heavily involved with distributing large quantities of methamphetamine and marijuana; 3) investigators made several arrests from 2007 to 2009 related to the "Macia's"; 4) in August 2009, a vehicle being driven by Jesus Leyva-Macias was stopped and two pounds of marijuana were seized; 5) during late 2009 or early 2010, Berry was the case agent in an investigation involving subjects known as "Sinaloa" and "Javier Macias," who were believed to be distributing large quantities of methamphetamine; 6) through this investigation, Berry learned the "Sinaloa" and "Javier Macias" were receiving large quantities of methamphetamine and cocaine from a western state thought to be California; 7) "Sinaloa" was identified as Louis Garcia when he was arrested in Nevada with 4.5 pounds of cocaine concealed in his vehicle; 8) following this arrest, investigators believed "Javier Macias" possibly fled the Waterloo area to go to California; 9) during the investigation, investigators executed warrants and found methamphetamine, currency, and forged documents;[16] 10) during the past two months preceding April 1, a CI informed Berry that a forty to fifty-year-old Hispanic male was involved in distributing large quantities of methamphetamine; 11) the CI knew the subject only by a description of his vehicle – a white mini-van; 12) this CI had provided valuable and corroborated information to Berry in the past two years which led to four search warrants and one arrest; 13) "on one certain occasion" within the previous two months the CI contacted Berry and advised him that the subject Hispanic male was driving the mini-van and informed Berry of the mini-van's location; 14) the CI also informed Berry that the subject Hispanic male was in possession of a quantity of methamphetamine consistent with the distribution of methamphetamine; 15) investigators located the mini-van, identified the make, model, and license plate of the mini-van, and followed it to the Oaklawn Avenue address; 16) during the "past several

---

[16] Officer Berry's addendum does not mention where the investigators found these items.

days," Berry confirmed that the mini-van was at the residence;[17] 17) Berry searched police records for this address and noted that MACIAS, FRANCISCO, J. had at one point reported a burglary to the residence; 18) Berry later searched Department of Transportation records and found the mini-van "returned to" LOPEZ-MACIAS, EDUARDO, born on February 24, 1981; 19) Berry could not find any more information about Lopez-Macias; 20) Berry searched other databases but failed to "positively identify the forty to fifty year old Hispanic male"; 21) on March 10, Berry performed surveillance at the Oaklawn Avenue address and observed the mini-van parked at the residence; 22) Berry also observed "a Hispanic male who met the descriptions given by the confidential informant coming to and from the residence" in a white Chevrolet Colorado truck; 23) Berry recognized the "target subject" from a previous investigation, during which the subject identified himself as "Javier Macias"; 24) Berry later searched DOT records and found out the truck "return[ed] to" LOPEZ-MACIAS, EDUARDO; 25) following the March 10 surveillance, Berry showed the CI a photograph of "Javier Macias" from the previous investigation and the CI confirmed it was the "same subject in question"; 26) Berry then applied for warrants to place a GPS device on the mini-van and the truck; 27) both warrants were granted; 28) over the next two weeks both vehicles were parked at the Oaklawn Avenue on most nights; 29) on March 18, investigators observed the truck was at a Waterloo bank; 30) after the truck left the bank, Berry passed the truck on the road and observed the driver was the "target Hispanic male"; 31) using subpoenas, investigators made contact with the bank and found that Hispanic male identified himself as MACIAS, FRANCISCO J., born on March 20, 1973; 32) the subject had made a check deposit of $14,000 into one account, along with a $3,000 cash deposit into another

---

[17] This language in Berry's addendum to his warrant application to search the residence implies that Berry confirmed the mini-van was still at the residence in the "past several days" prior to the April 1 search warrant. However, Berry uses identical language in his warrant applications for the GPS devices on March 11, implying that he confirmed the mini-van's location at the residence prior to the March 11 warrants.

account; 33) the subject identified his residence as a location in Moreno Valley, California; 34) on March 19, Berry observed via GPS that the mini-van appeared to be leaving the state; 35) on March 20, Berry observed that the vehicle only made stops of less than one hour and that the GPS lost power with the last contact in Leeds, Utah, a location consistent with traveling to California; 36) during the next week, investigators were issued a warrant to utilize phone "triangulation" to locate the target subject's cell phone; 37) the phone was found in Moreno Valley California; 38) on March 26, Berry observed via phone triangulation that the "target" was on his way back to Waterloo, IA; 39) on March 27, investigators intercepted the subject's vehicle west of Des Moines and followed the vehicle to a residence in Marshalltown, IA; 40) Berry observed the "target Hispanic male" entering and exiting the Marshalltown residence; 41) Berry then followed the mini-van to the Oaklawn Avenue address where he observed the subject entering the residence; 42) over the "past 24 to 72 hours" prior to the April 1 application for warrant, Berry utilized the CI to meet with the target and "make a controlled money transaction on a drug debt"; 43) when the application was submitted to Judge Lekar, Berry had been "unable to positively identify the target subject only identified through this investigation as MACIAS, FRANCISCO."

### 2. *Alleged Franks Violations*

As indicated above, Defendant does *not* claim that the search warrant for the Oaklawn Avenue residence and the vehicles was not supported by probable cause. Rather, Defendant claims that there were material omissions from the application and supporting documents, and that there was a misstatement of fact, constituting *Franks* violations. In *Franks v. Delaware*, 438 U.S. 154 (1978), the Court held that if a defendant establishes by a preponderance of the evidence that a sworn statement used by police to procure a search warrant contained perjury or reckless disregard for the truth, then the Court must determine whether the affidavit's remaining content is sufficient to establish probable cause. If not, then "the search warrant must be voided and the fruits of the search

excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156. *Franks* also applies to material that has been "deliberately or recklessly omitted from a search-warrant affidavit." *United States v. Scott*, 610 F.3d 1009, 1013 (8th Cir. 2010).

### a. Transfer of Ownership of the White Mini-Van

First, Defendant notes that information regarding the recent transfer in ownership of the mini-van was not included in Officer Berry's applications for the warrants to attach a GPS device to the two vehicles, nor was it included in Berry's later application for a search warrant on the house and the two vehicles. The applications for the GPS device were submitted on March 11, 2011, just four days after record ownership of the white mini-van changed hands. While that information "very well could have" been included in the information received by Berry, he testified credibly at the hearing that he was not aware of the recent transfer of ownership until Defendant filed the instant motion to suppress.

To prevail on this issue, Defendant must first prove that evidence regarding the recent transfer of ownership to the mini-van was "deliberately or recklessly omitted" from the affidavit. *Scott*, 610 F.3d at 1013. An intentional omission occurs when an officer "deliberately omit[s] vital information necessary to the magistrate judge's determination of probable cause." *United States v. Jacobs*, 986 F.2d 1231, 1233 (8th Cir. 1993). Given Officer Berry's credible testimony that he only learned of the transfer in ownership of the mini-van after Defendant filed his motion to suppress, the Court concludes that Defendant has failed to prove that the omission was deliberate or intentional.

The Court then turns to the question of whether information regarding the mini-van's recent change in ownership was "recklessly omitted" from the search warrant affidavit. In support of his argument, Defendant cites *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993). There, the officer submitted an affidavit indicating that a drug dog had shown "interest" in a package, but failed to include the fact that the dog did not

"alert" on the package. According to the Court, "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know." *Id.* at 1235. The Court held that the officer's failure to include the information and a reckless disregard for its consequences may be inferred if the defendant shows that "the omitted material would be 'clearly critical' to the finding of probable cause." *Id.* (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)). The Court in *Jacobs* concluded that "the omission occurred at least with reckless disregard of its effect upon the affidavit." *Id.* at 1234.

*Jacobs* involved information which was *known* to the officer, but was recklessly omitted from the affidavit, thereby affecting the probable cause determination. Defendant has not cited any case, nor have I found any, where a court has applied *Franks* to void a search warrant on the grounds that the officer recklessly failed to *discover* information which was available to him. As noted above, the Court has concluded that Officer Berry did not know of the recent transfer in ownership of the mini-van until Defendant filed a motion to suppress. It necessarily follows that Berry did not recklessly fail to include *known* information in the affidavit, as found in *Jacobs*. Instead, for Defendant to prevail on this issue, the Court must extend the holding in *Franks* from the reckless omission of known facts, to the reckless failure to discover facts which may be relevant to probable cause.

Even *if Franks* is properly extended to those cases where an officer recklessly fails to discover information relevant to probable cause, this is not the case. Officer Berry concedes that information regarding the recent transfer of the mini-van "very well could have" been included in the information which he reviewed, but that "I might not have seen that." However, when the vehicle was transferred, or who was the previous owner, was not "clearly critical" to the finding of probable cause. Berry's failure to ascertain this information cannot be described as "reckless." At most, Berry was negligent in failing to note when Lopez-Macias obtained ownership of the vehicle. However, "[a]llegations of

negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008) (citing *Franks*, 438 U.S. at 171). *See also United States v. Finley*, 612 F.3d 998, 1008 (8th Cir. 2010) ("Omission of those details may be a product of negligence, but only a reckless or deliberate falsehood violates *Franks*.").

Defendant's motion to suppress fails on this issue for another reason. Even *if* the Court finds that Officer Berry was reckless in his failure to discover the recent transfer in ownership, and the information should have been included in the affidavit, Defendant must still show that the affidavit, if supplemented with the omitted information, would not be sufficient to support a finding of probable cause. *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010). Stated otherwise, "*only* if the affidavit as supplemented by the omitted material *could not* have supported the existence of probable cause' will suppression be warranted." *Jacobs*, 986 F.2d at 1235 (quoting *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986)). The facts supporting probable cause, as set forth in Berry's affidavit, are enumerated in Part V.A.1 above. Adding information that the mini-van was transferred to Lopez-Macias on March 7, 2011 would not defeat the probable cause determination.

While it is not argued in his brief, Defendant complains in his motion that Officer Berry did not include Lopez-Macias' address – which is different from the Oaklawn Avenue address – in his affidavit. For the reasons discussed regarding the date when ownership of the van was transferred, the Court concludes that adding the address of Lopez-Macias would not have precluded a finding of probable cause by the magistrate. The affidavit clearly tied the mini-van to a Hispanic male, believed to be Francisco J. Macias, and the distribution of methamphetamine.[18]

---

[18] Defendant makes a similar argument regarding Officer Berry's failure to include information regarding the recent transfer in the mini-van's ownership in his application for the GPS tracking device. For the reasons set forth above, the Court finds that the omission

(continued...)

### b.    Identity of the Payor on a Check

Next, Defendant argues that Officer Berry's failure to identify the payor on a check deposited in Defendant's account on March 18, 2011 was a material omission. At the instant hearing, Berry testified that he "didn't remember exactly" when he learned of the check's source, but that he did not disclose it on the April 1, 2011 search warrant application because he did not think it was important.

Based on his testimony, the Court concludes that Officer Berry intentionally omitted information regarding the payor of the check. An intentional omission for *Franks* purposes, however, requires a deliberate omission of "vital information necessary to the magistrate judge's determination of probable cause." *Jacobs*, 986 F.2d at 1233. That is, Defendant must show that the affidavit, if supplemented with the omitted information, would not support a finding of probable cause. *Mashek*, 606 F.3d at 928. The facts supporting probable cause, as set forth in Berry's affidavit, are enumerated in Part V.A.1 above. Adding information about the identity of the payor of the check would not defeat the probable cause determination for three primary reasons.

First, it is not clear the check substantially contributed to the determination of probable cause and the issuance of the warrant. Defendant argues that by not identifying the payor, the affidavit "left the Magistrate with the impression that the check was drug proceeds." This Court doubts that a person purchasing drugs would pay using a $14,000 check, and also doubts that the issuing magistrate made this assumption.

Second, to the extent the check reference contributed to a finding of probable cause, it is not clear that disclosing the name of the payor would detract from probable cause. The payor, Armando Gonzalez, is not referred to elsewhere in the affidavit. Defendant fails to explain how disclosing his name to the magistrate would detract from probable

---

[18](...continued)
was not intentional or reckless. Moreover, its inclusion in the affidavit would not have defeated probable cause.

cause. That is, the magistrate presumably knew there was *some* payor. Simply giving the payor a name does not change whatever importance the magistrate may or may not have attached to the check, when additional information about the payor is unknown. Furthermore, disclosing the payor's name would not lessen the evidence of drug activity which ultimately led to the warrant for the Oaklawn Avenue residence.

Third, Officer Berry had no duty to further investigate the payor of the check or determine the subject of the payment. Defendant has offered no authority for that proposition and the Court has found none. As the Government points out, there are good reasons why authorities would not contact the payor, or investigate the circumstances surrounding the check, while the investigation was ongoing.

### c. Lack of Detail About a "Controlled Money Transaction"

Next, Defendant argues that Officer Berry's affidavit, which stated that "[o]ver the past 24 to 72 hours your affiant utilized the confidential informant to meet with the target in this investigation to make a controlled money transaction on a drug debt," contained material omissions. Specifically, Defendant asserts that the magistrate should have been advised whether the controlled transaction "did in fact occur," and if so, where it took place and with whom.[19]

Since Defendant has since received police reports regarding the March 29 transaction, he no longer questions whether it "did in fact occur." He continues to argue, however, that the affidavit should have provided more detail, including the fact that the transaction did not occur at the Oaklawn Avenue residence. The Court concludes there was no material omission in Officer Berry's affidavit with regard to *who* the informant met with. Berry identified the "target" as MACIAS, FRANSISCO in the previous sentence

---

[19] It should be noted, however, that in his amended motion to suppress, Defendant disclosed that following the filing of his initial motion, he received police reports regarding additional clandestine transactions, including one on March 29, 2011.

of the affidavit. It would have been clear to the issuing magistrate who Berry was referring to when he said the CI met with the "target."

Defendant also complains that Officer Berry omitted from his affidavit where the controlled transaction took place. It is not clear from Berry's testimony at the instant hearing where the transaction took place. Berry testified "[it] could very well be the truth" that *after* the Defendant met with the CI on March 29, the Defendant was followed to a location at Elk Run Heights.

If the transaction had taken place at the Oaklawn Avenue location, then the affidavit with the supplemented information would only increase support for a finding of probable cause and there would be no *Franks* violation. *See Mashek*, 606 F.3d at 928. If the transaction took place elsewhere, then to constitute a *Franks* violation, Defendant would have to demonstrate that Officer Berry intentionally or recklessly omitted this information from his affidavit. The Court does not make that finding. Even if Berry intentionally or recklessly omitted the information about where the "controlled money transaction" occurred, it would have no significant effect on the probable cause determination. The facts enumerated in Part V.A.1, supplemented by the location of the controlled buy, would still support a finding of probable cause.

### d. Information in Warrant for Cell Phone Conflicts with Other Warrants

Defendant also argues that information in the cell phone warrant application conflicts with information in the house warrant application. Specifically, Defendant notes that the cell phone warrant asserted that investigators "have been investigating Francisco J. Macias possible DOB 03/20/1971. . ." and that the affiant[20] "learned that Francisco J. Macias" used a specific phone number to arrange drug trafficking. The application also asserts that the CI confirmed this was in fact Francisco J. Macias's phone number.

---

[20] Special Agent John J. Austin prepared this affidavit, not Officer Berry.

Defendant contends that information in the cellular phone affidavit is contrary to Officer Berry's affidavit for the house warrant. In that warrant, Berry said police have been "unable to positively identify the target subject identified through this investigation as Macias, Fransisco."

The Court concludes that Officer Berry's statement was not an intentional or reckless misstatement. At the instant hearing, Berry testified that what he meant when he wrote on his affidavit that he was "unable to positively identify the target subject identified through this investigation as Macias, Fransisco[,]" is that he was never able to obtain a driver's licence that had a picture of the Defendant with his date of birth, nor a criminal history where he could obtain a photo and confirm his name. He testified further that "[w]e just weren't 100 percent sure that was his name [and] I don't feel comfortable listing a name that you know I'm only 50 percent sure of." Although Special Agent Austin referred to the subject as Fransisco J. Macias in the cell phone warrant, it is not a misstatement for Berry to say that he was "unable to positively identify" the subject in his affidavit for the house warrant when he was not 100 percent sure of the name of the target subject. As noted in Plaintiff's brief, the use of false names and identifying information is common in criminal society.

Even if this were a reckless or intentional misstatement, the Defendant "must show that the affidavit would not establish probable cause if the allegedly false information is ignored[.]" *Mashek*, 606 F.2d at 928 (citation omitted). If anything, Officer Berry's admitted uncertainty about the identity of the target detracts from probable cause. If this uncertainty were ignored, the facts enumerated in enumerated in Part V.A.1 would certainly establish probable cause.

### e. *Cumulative Effect of Omissions and Misstatements*

Even if the Court were to conclude all alleged omissions and misstatements were made intentionally or recklessly, the affidavit would still establish probable cause to search the Oaklawn Avenue residence. *See United States v. Snyder*, 511 F.3d 813, 817 (citing

*United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). The affidavit for the warrant to search the home would still include the following facts[21]: 1) the affiant, Officer Berry, has been a Waterloo police officer since 2004 and was assigned to the Tri-County Drug Enforcement Task Force in March 2009; 2) previous to this investigation, Berry and other investigators had been aware of a family residing in the Waterloo area, who they referred to as the "Macias's," that was heavily involved with distributing large quantities of methamphetamine and marijuana; 3) investigators made several arrests from 2007 to 2009 related to the "Macia's"; 4) in August 2009, a vehicle being driven by Jesus Leyva-Macias was stopped and two pounds of marijuana were seized; 5) during late 2009 or early 2010, Berry was the case agent in an investigation involving subjects known as "Sinaloa" and "Javier Macias," who were believed to be distributing large quantities of methamphetamine; 6) through this investigation, Berry learned the "Sinaloa" and "Javier Macias" were receiving large quantities of methamphetamine and cocaine from a western state thought to be California; 7) "Sinaloa" was identified as Louis Garcia when he was arrested in Nevada with 4.5 pounds of cocaine concealed in his vehicle; 8) following this arrest, investigators believed "Javier Macias" possibly fled the Waterloo area to go to California; 9) during the investigation, investigators executed warrants and found methamphetamine, currency, and forged documents;[22] 10) during the past two months preceding April 1, a CI informed Berry that a forty to fifty-year-old Hispanic male was involved in distributing large quantities of methamphetamine; 11) the CI knew the subject only by a description of his vehicle – a white mini-van; 12) this CI had provided valuable and corroborated information to Berry in the past two years which led to four search warrants and one arrest; 13) "on one certain occasion" within the previous two months the CI contacted Berry and advised him that the subject Hispanic male was driving the mini-

---

[21] Omissions and redacted statements are made in italics.

[22] Officer Berry's addendum does not mention where the investigators found these items.

van and informed Berry of the mini-van's location; 14) the CI also informed Berry that the subject Hispanic male was in possession of a quantity of methamphetamine consistent with the distribution of methamphetamine; 15) investigators located the mini-van, identified the make, model, and license plate of the mini-van, and followed it to the Oaklawn Avenue address; 16) during the "past several days," Berry confirmed that the mini-van was at the residence;[23] 17) Berry searched police records for this address and noted that MACIAS, FRANCISCO, J. had at one point reported a burglary to the residence; 18) Berry later searched Department of Transportation records and found the mini-van "returned to" LOPEZ-MACIAS, EDUARDO, born on February 24, 1981, *who became record holder on March 7*; 19) Berry could not find any more information about Lopez-Macias; 20) Berry searched other databases but failed to "positively identify the forty to fifty year old Hispanic male"; 21) on March 10, Berry performed surveillance at the Oaklawn Avenue address and observed the mini-van parked at the residence; 22) Berry also observed "a Hispanic male who met the descriptions given by the confidential informant coming to and from the residence" in a white Chevrolet Colorado truck; 23) Berry recognized the "target subject" from a previous investigation, during which the subject identified himself as "Javier Macias"; 24) Berry later searched DOT records and found out the truck "return[ed] to" LOPEZ-MACIAS, EDUARDO; 25) following the March 10 surveillance, Berry showed the CI a photograph of "Javier Macias" from the previous investigation and the CI confirmed it was the "same subject in question"; 26) Berry then applied for warrants to place a GPS device on the mini-van and the truck; 27) both warrants were granted; 28) over the next two weeks both vehicles were parked at the Oaklawn Avenue on most nights; 29) on March 18, investigators observed the truck was

_____

[23] This language in Berry's addendum to his warrant application to search the residence implies that Berry confirmed the mini-van was still at the residence in the "past several days" prior to the April 1 search warrant. However, Berry uses identical language in his warrant applications for the GPS devices on March 11, implying that he confirmed the mini-van's location at the residence prior to the March 11 warrants.

at a Waterloo bank; 30) after the truck left the bank, Berry passed the truck on the road and observed the driver was the "target Hispanic male"; 31) using subpoenas, investigators made contact with the bank and found that Hispanic male identified himself as MACIAS, FRANCISCO J., born on March 20, 1973; 32) the subject had made a check deposit of $14,000 into one account, along with a $3,000 cash deposit into another account; 33) *investigators determined the check was issued by Armando Gonzalez in payment for a restaurant*; 33) the subject identified his residence as a location in Moreno Valley, California; 34) on March 19, Berry observed via GPS that the mini-van appeared to be leaving the state; 35) on March 20, Berry observed that the vehicle only made stops of less than one hour and that the GPS lost power with the last contact in Leeds, Utah, a location consistent with traveling to California; 36) during the next week, investigators were issued a warrant to utilize phone "triangulation" to locate the target subject's cell phone; 37) the phone was found in Moreno Valley California; 38) on March 26, Berry observed via phone triangulation that the "target" was on his way back to Waterloo, IA; 39) on March 27, investigators intercepted the subject's vehicle west of Des Moines and followed the vehicle to a residence in Marshalltown, IA; 40) Berry observed the "target Hispanic male" entering and exiting the Marshalltown residence; 41) Berry then followed the mini-van to the Oaklawn Avenue address where he observed the subject entering the residence; 42) *[over the "past 24 to 72 hours" prior to the April 1 application for warrant, Berry utilized the CI to meet with the target and "make a controlled money transaction on a drug debt"] (omitted); 43) [when the application was submitted to Judge Lekar, Berry had been "unable to positively identify the target subject only identified through this investigation as MACIAS, FRANCISCO."] (omitted)*.

The Court concludes that an affidavit of this nature would "lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime'" would be found at the Oaklawn residence. *Grant*, 490 F.3d at 627; *Snyder*, 511 F.3d at 817

(same). Accordingly, Defendant's motion to suppress based on alleged *Franks* violations is without merit.

## B. The Government's Leon Claim

The Government argues that even if the search warrant was not supported by probable cause, the good faith exception found in *Leon* applies. Because Defendant concedes that the affidavit submitted in support of the search warrant for the house and vehicles supported a finding of probable cause, and since the Court has found no *Franks* violations, I believe it is unnecessary for the district court to consider the Government's alternative argument that the officers acted in good faith, thereby precluding application of the exclusionary rule. Nonetheless, in the event the district court disagrees with my analysis on the *Franks* issues, the Court will also address the arguments regarding *Leon*.

The good faith exception provides that disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). The Supreme Court has identified four circumstances, however, in which an officer's reliance on a search warrant would be objectively unreasonable, including "when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge." *Grant*, 490 F.3d at 632 (citing *Leon*, 468 U.S. at 923). Accordingly, *if* the Court finds a *Franks* violation, then it precludes a finding of objective reasonableness, as required by *Leon*. *United States v. Finley*, 612 F.3d 998, 1003 (8th Cir. 2010) ("We do not address whether the good faith exception to the exclusionary rule applies in this case, although we note that our precedent appears to foreclose such a result if a *Franks* violation has occurred.") (citing *United States v. Gipp*, 147 F.3d 680, 688 (8th Cir. 1998)); *Jacobs*, 986 F.2d at 1235 ("under *Leon*, a *Franks* violation is not excused").

Therefore, *if* the district court finds that a *Franks* violation occurred, and that after the appropriate changes to the affidavit were made it no longer supported probable cause for the search warrant, then the Government may *not* rely on the good faith exception found in *Leon*. Under those circumstances, the motion to suppress would be granted.

## *VI. RECOMMENDATION*

For the reasons set forth above, I respectfully recommend that the Motion to Suppress Evidence (docket number 19), as amended (docket number 32), filed by the Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on June 13, 2011.*

DATED this 24th day of June, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA